

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOYCE A. PARKER,                              )
                                             )
                    Plaintiff,                )
                                             )
        v.                                    )        No. 03 C 0171
                                             )
CITY OF ELGIN,                                )        Judge Rebecca R. Pallmeyer
                                             )
                    Defendant.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Joyce Parker, an African-American woman, began working as City Manager for the City of Elgin in 1997. Her tenure as City Manager was a rocky one, marked by an ongoing dispute with the Mayor and a debilitating eye condition. In January 2002, the City Council asked for her resignation. Plaintiff now brings suit against the City of Elgin, alleging that her termination was the product of race discrimination in violation of 42 U.S.C. § 1981 (Count I) and § 1983 (Count II). She also alleges that her termination occurred without due process of law, in violation of § 1983 (Count III) and represented a breach of her employment contract (Count IV). Defendant moves for summary judgment. For the reasons set forth below, Defendant's motion is granted.

## FACTUAL BACKGROUND

### Plaintiff's Hiring as City Manager

Plaintiff began working as the City Manager for the City of Elgin, Illinois in October 1997. (Defendant's Local Rule 56.1(a) Statement, hereinafter "Def.'s 56.1(a)," ¶ 10.) Some months earlier, she had been contacted by a search firm retained by the City to fill the position. (*Id.* ¶ 5-6.) After Plaintiff expressed interest, the firm arranged for her to be interviewed by the City Council.

(*Id.* ¶ 6.) The full seven-member City Council conducted two interviews with Plaintiff. (*Id.* ¶ 7-8.) Ultimately, she was offered the position over one other finalist, a white male. (*Id.* 11.)

After receiving the offer of employment, Plaintiff began negotiating the terms of her contract with City Council member Robert Gilliam. (*Id.* ¶ 12.) During these negotiations, Plaintiff requested and received certain benefits that had not been included in the employment contracts of prior city managers. (*Id.* ¶ 13.) Specifically, she requested that the City make pension fund contributions and provide reimbursement for relocation expenses. (*Id.* ¶ 14-15.) Ultimately, the contract provided that, in addition to its contributions to the Illinois Municipal Retirement Fund, the City would contribute $7,500 annually to a qualified retirement plan of Plaintiff's choosing. (*Id.* ¶ 3.) In addition, the contract provided for reimbursement of all moving expenses, as well as a $1,000 monthly temporary housing allowance to be paid for up to six months. (*Id.* ¶ 6-7.) Plaintiff also requested that she be provided with a Chevy Blazer; some Council members believed that this was not appropriate under Plaintiff's employment contract, which provided for the City to lease her a "mid-sized" vehicle, but that request, too, was granted. (*Id.* 16; Affidavit of Robert Gilliam, Appendix to Def.'s Motion for Summary Judgment, hereinafter "Gilliam Affidavit," ¶ 14-15.)

The contract between the City and Plaintiff provided that she would be paid an annual salary of $116,000.00. The contract did not include an explicit authorization for an automatic cost of living increase, instead providing that the City would conduct a salary review annually. (Employment Contract, Parker Dep., Ex. 1, ¶ 2.) In Plaintiff's view, this provision did effectively guarantee her an annual cost of living increase contingent on a satisfactory job performance review. (Parker Dep., at 234.) Regarding duration, the contract provided that the agreement would apply for an "indefinite term," and that Plaintiff could terminate the contract upon written notice to the

2

Mayor and City Council "at least twenty-eight (28) days before, but not more than forty-five (45) days before the effective date of said notice of termination, unless otherwise agreed by City of Elgin." (*Id.* ¶ 1.) The contract made no reference to cause for termination, instead providing that the contract "may be terminated by the City acting through its corporate authorities." (*Id.*) Upon termination, Plaintiff was entitled to severance pay up of three quarters of her annual salary if terminated prior to January 1, 2000; thereafter, she would be entitled to severance pay of one half of her annual salary. (*Id.* ¶ 8.) Finally, the contract stated that "[e]xcept as modified by the terms and provisions contained therein, Joyce Parker shall be entitled to all other benefits and privileges afforded to Class A management level employees under applicable ordinances of the City of Elgin." (*Id.* ¶ 13.) The contract was signed by both Plaintiff and Kevin Kelly, then Mayor of Elgin. (Plaintiff's Statement of Additional Material Facts, ¶ 112; Employment Contract, at 3.)

## Plaintiff's Tenure as City Manager

The City Manager post is the highest appointed position within the City government and reports to both the City Council and Mayor. (Def.'s 56.1(a) ¶ 22-23.) As City Manager, Plaintiff was responsible for the day-to-day operation of the City and for implementing the policy decisions made by the City Council. (Plaintiff's Statement of Additional Material Facts, hereinafter "Pl.'s 56.1(a)," ¶ 109.) In addition, the City Manager is responsible for preparing a municipal budget for consideration of the City Council. (*See* City of Elgin website, "Council/Manager Form of Government," *at* http://www.cityofelgin.org/index.asp?NID=62#q04.)

In early 1999, then-Mayor Kelly conducted the first annual review of Plaintiff's job performance. (Parker Dep., at 69-70.) During this meeting, Plaintiff maintains that Mayor Kelly told her that, during his tenure, the two prior city managers, both white males, had been advised of

3

their performance problems and had been given an opportunity to correct them. (Pl.'s 56.1(a) ¶ 116.) Following this meeting, the substance of which is not in the record, the City Council increased her salary by 3.5%, retroactive to January 1, 1999. (Def.'s 56.1(a) ¶ 24.) In January 2000, the City Council again raised Plaintiff's salary by 3.5%. (Id. ¶ 26.)

In April 2000, Council member Ed Schock, a white male, defeated incumbent Kevin Kelly in the City of Elgin mayoral election. (Pl.'s 56.1(a) ¶ 120.) From the beginning of Schock's tenure,[1] Plaintiff claims that the Mayor had little contact with her, instead choosing to deal directly with a number of her subordinates, all of whom were white males. (Parker Dep., at 81-84.) Shortly after the election, Plaintiff met with Schock to discuss, among other things, her job performance. (Id. ¶ 121.) During this discussion, Plaintiff inquired about her annual evaluation, which had been postponed until after the mayoral election. Schock responded by saying that she "might not be around very long." (Id.) Plaintiff understood him to mean that she should not be too concerned about the substance of her annual evaluation, because her employment might be terminated soon.[2] (Parker Dep., at 110.) Plaintiff later told Council members Marie Yearman and Robert Gilliam about the Mayor's comments, as well as his treatment of her. (Id. at 119.) Yearman told Plaintiff that she felt that Schock "had a problem with women." (Id.) Gilliam, on the other hand, stated that he did not believe Plaintiff would have any problems working with Schock, and that he didn't realize there had been any problems up to that time. (Id. at 118.)

---

[1]    The record does not reflect when Schock was sworn in as Mayor of Elgin.

[2]    Plaintiff did not elaborate on the basis for this conclusion during her deposition, nor did either party present Schock's version of this conversation.

4

On November 9, 2000, Mayor Schock sent a memorandum to Plaintiff presenting a number of criticisms directed at Plaintiff's handling of various budget-related matters. (Def.'s 56.1(a) ¶ 28.) In this memorandum, Mayor Schock noted that: (1) the City's five-year plan[3] did not include amounts budgeted for municipal streetscape improvements; (2) he had not received a previously-requested cost estimate for the implementation of a compensation study; (3) the funding for economic development initiatives "seems a little light"; and (4) no funding had been budgeted for a number of special municipal events. (Id.) A copy of this memorandum was also forwarded by the Mayor to all City Council members, although the letter itself did not indicate that copies were provided to them. (Parker Dep. at 159-60.) Prior to sending the memorandum, Mayor Schock and Council member Steward Wasilowski contacted two of Plaintiff's subordinates, Jim Nowicki and Sean Stegall, regarding these issues. (Parker Dep., at 160-62.) Nowicki and Stegall both later contacted Plaintiff independently, alerting her that Schock and Wasilowski had contacted them regarding budget issues and had "implied that something had been done inappropriately," presumably by Plaintiff or her staff. (Id. at 162-65; Pl.'s 56.1(a) ¶ 130.)

Between November 9 and November 14, 2000, Plaintiff again spoke with Council member Gilliam, and told him that the concerns raised in the Mayor's memorandum were not accurate. (Id. ¶ 132.) Gilliam urged Plaintiff to respond to the memorandum, which, in Gilliam's opinion, was intended as a criticism of her performance as city manager. (Parker Dep., at 167-68.) Plaintiff did prepare a responsive memorandum on November 14, 2000 sent to both the Mayor and City Council

---

[3] The record does not when the five-year budget was prepared, or by whom it was prepared. The court presumes Plaintiff was responsible for the five-year plan and the other budgetary matters discussed in the November 9 memorandum.

members, in which she expressed her disappointment that the Mayor "did not take a less formal approach in addressing [his] concern" regarding her performance, her dismay that the Mayor's November 9 memorandum was forwarded to the City Council without her knowledge, and her belief that the Mayor had "compromised" the staff by instructing his secretary to conceal from Plaintiff the fact that copies of the memorandum were being sent to others. (Def.'s 56.1(a) ¶ 30.) Finally, Plaintiff explained that she was voicing these concerns in hopes of "establishing a good working relationship" with the new mayor. (Id.)

On receiving a copy of Plaintiff's memorandum, Gilliam told her that some members of the City Council thought that the language in the memorandum was "very strong." (Parker Dep., at 179-80.) He also told her that she should speak with the Mayor, because he was disappointed and insulted by the memorandum. (Id. at 180-83.) More broadly, Gilliam suggested that she try to meet with the Mayor more frequently in order to develop a better working relationship. (Id. at 183.) Shortly thereafter, Plaintiff did meet with Mayor Schock.[4] (Id. at 186-87.) During the short meeting, Plaintiff apologized to the Mayor and explained that she had not meant to insult him. (Id.) Plaintiff and Mayor Shock agreed to meet more regularly in order to facilitate more open communication. (Id. at 188-90.)

### The End of Plaintiff's Tenure as City Manager

On July 11, 2001, the Elgin City Council convened a meeting. (Def.'s 56.1(a) ¶ 35.) The City claims that the meeting was scheduled to review Plaintiff's job performance, (Affidavit of Robert Gilliam, Ex. 1 to Def.'s Appendix, hereinafter "Gilliam Affidavit," ¶ 26), but Plaintiff claims that the

---

[4]    Plaintiff does not recall the exact date, nor how long it occurred after her conversation with Gilliam. (Id. at 186.)

6

matter of her performance was not listed on the meeting agenda.[5] (Parker Dep., at 206-08.) In any event, the issue did arise. During the general public meeting, the Mayor requested that the Council go into an executive session, closed to the public. (Parker Dep., at 208.) Plaintiff ordinarily attended both the general and executive sessions of the City Council meeting, but on this occasion, Mayor Schock asked that she not attend the executive session. (Id. at 210.) Plaintiff left the meeting, though she remained in the building because she had previously read a newspaper article reporting that the Council would hold an executive session to discuss her job performance.[6] (Id.) After approximately an hour, Plaintiff was asked to rejoin the meeting, and each Council member had an opportunity to apprise Plaintiff of any concerns he or she had regarding her performance. (Parker Dep., at 215-17.) According to Plaintiff,[7] at least four members of the Council – Marie Yearman, Juan Figueroa, Ruth Munson, and Robert Gilliam – expressed no concerns regarding her performance. (Id. at 217-18.) Another, John Walters, stated that he was initially concerned that Plaintiff did not have sufficient experience in development, but that he believed she had "gotten up to speed" and that things were running smoothly. (Id. at 218.) Mayor Schock and Council member Stuart Wasilowski both expressed concerns regarding her performance; they cited missed meetings, interaction with staff, and failure to get involved in certain zoning projects. (Parker Dep., at 218-

---

[5]     The record does not include a copy of the meeting agenda.

[6]     The court is uncertain how or why this information reached the press.

[7]     Defendant presents its own, slightly different version of this meeting and the Council members' comments. Its version is based only on the affidavit of Council member Gilliam, however, and thus constitutes inadmissible hearsay insofar as it purports to relate the comments of other Council members. Gilliam did not, in his affidavit, contest Plaintiff's assertion that he did not express any concerns with her performance during the meeting.

7

19.) Following these comments, the Council[8] informed Plaintiff that they planned to conduct an evaluation of Plaintiff's job performance and to establish goals and objectives for the upcoming year. (Parker Dep., at 220.) The Council also advised Plaintiff that she would receive a 3.5% salary increase, an increase Plaintiff claims was based upon her performance. (*Id.* at 225; Pl.'s 56.1(a) ¶ 145.)

On July 25, 2001, Plaintiff sent a memorandum to the City Council in which she addressed a number of recent media reports regarding the Council's dissatisfaction with her performance as City Manager. (Def.'s 56.1(a) ¶ 50.) In the memo, Plaintiff began by thanking the Council for the recent "cost of living increase." She then turned her attention to the July 11 City Council meeting, in which she understood the Council to have raised two primary issues of concern regarding her performance: overall communication and staff interaction. In the memorandum, Plaintiff identified a number of steps that she had taken to remedy the Council's concerns, and requested further discussion "in order to gain a clearer understanding" of the Council's expectations. (*Id.*)

In late 2001, a number of City Council members completed a "City Manager Evaluation Checklist," in which they rated numerous aspects of Plaintiff's job performance on a 1 to 4 scale (1 being "poor" and 4 being "excellent"). Council member Figueroa gave Plaintiff an overall rating of "4," and an overall average rating (in forty-three areas) of 3.8. (Plaintiff's Opposing Materials in Opposition to Motion for Summary Judgment, Ex. 3.) Council member Yearman rated Plaintiff a "3," with an average rating of 3.3. (*Id.*) Council member Gilliam did not state an overall

---

[8]    The record does not reflect which Council member(s) made this statement.

evaluation, but gave Plaintiff an average rating of 3.6. (*Id.*) Evaluations by the remaining City Council members, if any, do not appear in the record.

At some point between July and September 2001, Plaintiff spoke with William Cogley, the City's Corporation Counsel. (Pl.'s 56.1(a) ¶ 117.) Cogley advised Plaintiff that a prior City Manager, a white male, had been provided with notice of his performance deficiencies and an opportunity to correct those deficiencies before the City Council and Mayor moved to terminate his employment. (Parker Dep., at 329.) In a subsequent conversation with Cogley concerning the possible termination of a female employee on Plaintiff's staff, Cogley recommended that Plaintiff employ a "progressive discipline" process before moving to terminate the employee, i.e., informing the employee about any performance deficiencies and allowing her an opportunity to improve her performance.[9] (*Id.* at 327-28.) According to Plaintiff, Cogley employed this progressive discipline approach himself in the course of terminating an employee in his office. (*Id.*)

**Plaintiff's Vision Problems**

In August 2001, Plaintiff underwent a surgical procedure on her left eye. (Def.'s 56.1(a) ¶ 51.) Plaintiff had been suffering from glaucoma as well as chronic iritis, an inflammation in the eye causing severe pain, redness, sensitivity to light, and blurred vision. (*Id.* ¶ 52.) The eye problems had compromised her ability to perform as City Manager because she had difficulty reading and traveling outdoors. (*Id.* ¶ 53.) Immediately following the surgery, Plaintiff was absent from work for approximately two and a half weeks. (*Id.* ¶ 54.) She returned to work in September, but by October 31, her eye had not yet healed properly, and her physician suggested that she take more time off from

---

[9]     The record does not reflect the race of this employee.

9

work. (*Id.* ¶ 56-57.) Parker informed the City Council that she would be on leave until November 12;[10] she did not actually return to work until November 25. (*Id.* ¶ 58.)

On December 5, 2001, Plaintiff met with the City Council to discuss her medical condition. (*Id.* ¶ 66.) She explained that her eye condition had not yet improved, and requested an extended medical leave. (*Id.* ¶ 67.) The Council suggested that she see a specialist. (*Id.* ¶ 68.) Beginning in mid-December, Parker took another medical absence. (*Id.* ¶ 59.) She expected to return to work the first week of January 2002. Another eye flare-up prevented her return, however, and Plaintiff never returned to work after her December 10, 2001 leave of absence. (*Id.* ¶ 59-61.)

In early January 2002, Plaintiff spoke with City Corporation Counsel William Cogley about possible alternative employment options due to her medical condition. (*Id.* ¶ 69.) She also spoke with Assistant City Manager Femi Folarin and Council members Gilliam and Munson. (*Id.* ¶ 70-71.) According to Plaintiff, she told them that she did not want to burden the City with her medical problem and that if "they wanted to try to work something out with [her], [she] would be open to that." (Parker Dep., at 278.) On January 9, 2002, the City Council discussed Plaintiff's medical condition. (Def.'s 56.1(a) ¶ 75.) Cogley reported to the Council that Plaintiff's condition had not improved, and that she had offered to resign her position as City Manager if the Council felt it appropriate. (*Id.* ¶ 76.) The Council determined that such a resignation was not necessary, and instead granted Plaintiff medical leave until she was able to return to work. (*Id.* ¶ 79-80.)

---

[10]     Plaintiff could not recall the exact date of this conversation.

**Plaintiff's Termination**

In January 2002 (presumably after January 9), City Council members attended a retreat with an outside facilitator, during which they discussed their concerns regarding Plaintiff's performance and lack of leadership.[11] (Gilliam Affidavit ¶ 41-43.) Although the City Council had declined to accept her resignation just three days earlier, on January 12, Gilliam spoke with Plaintiff about the possibility of submitting her resignation. (Def.'s 56.1(a) ¶ 89.) He told Plaintiff that he and the Council felt that "it was time for a change." (*Id.* ¶ 90.) Again, although she had been prepared to resign on January 9, after meeting with Gilliam, Plaintiff hired an attorney and attempted to negotiate the terms of a settlement agreement. (*Id.* ¶ 91.)

The negotiations did not prove fruitful, and on February 13, 2002, the City Council unanimously voted to terminate Plaintiff's employment as City Manager. (*Id.* ¶ 94.) The following day, Plaintiff's termination was reported in the *Courier News*, the local newspaper. (Anne Marie Apollo, *Elgin council axes manager*, COURIER NEWS, Feb. 14, 2002, at A1, Ex. 4 to Plaintiff's Opposing Materials.) The article quoted Mayor Schock as saying that Plaintiff had been fired for poor performance. The article also cited unnamed sources within the City who stated that "[a]fter recently receiving a poor performance evaluation, Parker had been expected to 'resign' her position due to health reasons." (*Id.*) The City awarded Plaintiff severance pay equal to one-half of her annual salary – $64,305.50. (Letter from William Cogley, dated February 14, 2002, Ex. 9 to Parker Dep.) Plaintiff did not speak to any Council members regarding their decision to terminate her. (*Id.*

---

[11]     As Plaintiff correctly notes, Council member Gilliam's account of the substance of his colleagues' remarks during this meeting are inadmissible hearsay.

¶ 95.) Following her termination, Femi Folarin, a black male who had served as the Assistant City Manager during Plaintiff's tenure, became the interim City Manager. (*Id.* ¶¶ 96-97.)

In December 2002, Plaintiff's doctor cleared her to return to work. (Pl.'s 56.1(a) ¶ 161.) Plaintiff immediately began searching for new employment, and began working that same month as a consultant for the City of Flint, Michigan, earning $52 per hour. (*Id.* ¶ 162, 165.) In July 2003, the City of Flint hired Plaintiff to serve as the City's Director of Community and Neighborhood Services, for which she receives an $85,000 annual salary plus benefits. (*Id.*)

On January 9, 2003, Plaintiff filed this lawsuit, in which she challenges her termination as a civil rights violation, a denial of due process, and a breach of contract claim. Defendant now moves for summary judgment.

## DISCUSSION

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is appropriate only if, on the record as a whole, no rational trier of fact could find for the non-moving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). Although the court will draw inferences in favor of the non-moving party, the court is "'not required to draw every conceivable inference from the record.'" *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004), quoting *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004). Thus, "[i]nferences

that are supported only by conjecture or speculation will not defeat a summary judgment motion."
*Id.*

## I.    §§ 1981 and 1983 Equal Protection Claims

An employee alleging discrimination can proceed either directly, by presenting direct or circumstantial evidence of discriminatory intent, or indirectly, by utilizing the so-called *McDonnell Douglas* burden-shifting method. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004), *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Although Plaintiff has introduced comments by a coworker regarding Mayor Schock's alleged problems with women, she has not attempted to prove that her termination was motivated by race or gender under the direct method. In order to establish a *prima facie* case of discrimination under the indirect, or burden-shifting, method, she must demonstrate that: (1) she is a member of a protected class; (2) she was meeting the City's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) the City treated similarly situated employees who were neither African-American nor female more favorably. *Williams v. Seniff*, 342 F.3d 774, 788 (7th Cir. 2003); *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 704 (7th Cir. 2003), *citing Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742-43 (7th Cir. 1999); *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998). If she meets this burden, the City must produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Williams*, 342 F.3d at 788, *citing Helland v. South Bend Cmty. Sch. Corp.*, 93 F.3d 327, 329 (7th Cir. 1996). Finally, if Defendant is able to articulate a nondiscriminatory reason for its decision, Plaintiff can defeat summary judgment if she can present evidence that creates a genuine issue of fact on the question whether the proffered reasons are pretextual. *Williams*, 342 F.3d at 788, *citing Bruno v. City of Crown Point*, 950 F.2d 355, 363 (7th Cir. 1991).

There is no dispute that Plaintiff, an African-American woman, is in a protected class, and suffered an adverse employment action when she was terminated. Defendant contends, however, that Plaintiff was neither meeting the City's legitimate employment expectations nor treated differently than similarly situated white male employees. In regards to her job performance, Defendant urges that Plaintiff's "performance deficiencies ultimately caused the Council to lose confidence in her ability to lead and be an effective City Manager." (Defendant's Memorandum of Law in Support of Motion for Summary Judgment, hereinafter "Defendant's Brief," at 7.) Specifically, Defendant claims that Plaintiff "responded poorly to criticism and demonstrated paltry leadership skills."[12] (*Id.* at 6.)

Plaintiff, on the other hand, points to substantial evidence that her performance prior to her termination was adequate. Although Mayor Schock and Council Member Wasilowski both expressed dissatisfaction with Plaintiff's job performance during the July 11, 2001 City Council meeting, the remaining five members of the Council expressed no concern as to Plaintiff's competence or performance. Furthermore, following the meeting, the Council gave Plaintiff a 3.5% salary raise. The parties disagree over whether the annual 3.5% increases to Plaintiff's salary were automatic cost-of-living increases or discretionary raises contingent on her performance, but Plaintiff's employment contract itself states that "A salary review shall be conducted based upon

---

[12]     As Plaintiff correctly notes, much of Defendant's evidence of the Council and Mayor's dissatisfaction with Plaintiff's performance is presented in the form of inadmissible hearsay. Specifically, Defendant presents an affidavit of Council Member Gilliam and a number of newspaper articles, all of which related statements regarding the dissatisfaction of Mayor Schock and certain Council members, especially Wasilowski, with Plaintiff. The court disregards hearsay evidence for purposes of this decision. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996), *citing Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1518-19 (7th Cir. 1992).

Joyce Parker's performance on January 1, 1999 and annually thereafter." (Employment Contract, Parker Dep., Ex. 1, ¶ 2.) To the extent that Defendant disputes Plaintiff's contention that the salary increases were linked at least in part to her performance, the issue is a question of fact not proper for summary judgment. Furthermore, in late summer and early fall 2001, a number of City Council members completed formal evaluations of Plaintiff's job performance. All of these evaluations can be characterized as positive, and none suggested that Plaintiff's performance was inadequate or that her job was in danger. Finally, just three days before asking her to resign, the Council had declined to accept Plaintiff's offer to do just that. The court finds a genuine issue of fact regarding whether or not Plaintiff's performance as City Manager satisfied the City's legitimate employment expectations.

Turning to the final element necessary to establish a *prima facie* case of discrimination, Plaintiff urges that she was not treated in the same manner as similarly situated employees in the course of her termination. Though she contends her own performance was acceptable, she also asserts that prior City Managers were provided with notice of any deficiencies in their performance, and the opportunity to improve their performance, prior to any termination efforts – courtesies not provided to Plaintiff.[13] In addition, Plaintiff claims that other "Class A" employees of the City were provided with notice and opportunity to correct their performance deficiencies. Plaintiff insists that she was entitled to the same privileges as Class A employees under her contract.

In order to demonstrate that she was treated less favorably than employees outside the protected class who were similarly situated, Plaintiff must identify employees who were "directly

---

[13]     By arguing that she was entitled to notice and an opportunity to be correct her deficiencies, Plaintiff arguably concedes that her job performance was deficient.

comparable to her in all material respects." *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted). When determining whether two employees are directly comparable, a court will consider all relevant factors, including whether the employees: (1) held the same job description; (2) were subject to the same standards; (3) were subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications.

Defendant urges that Plaintiff has not established that any prior City Managers were similarly situated to her. Specifically, Defendant notes that Plaintiff has presented no evidence regarding the contractual relationships between her predecessors and the City or the identity of the City Council members during their tenures. Plaintiff has not, for example, presented any evidence detailing the City's treatment of the prior City Managers save vague statements by Mayor Kelly that other City Managers at some point received notice that their performance was deficient and subsequently had an opportunity to rectify the deficiencies. Plaintiff concedes that she has no knowledge or evidence of the circumstances surrounding her predecessor's performance deficiencies, let alone evidence that these deficiencies were similar to those which led, according to Defendant, to her own termination. In fact, she has not even offered evidence on whether her predecessors were ever threatened with termination, were actually terminated from their positions as City Manager, or left of their own accord. Nor does Plaintiff present any evidence of the type of notice and opportunity to rectify which she claims her predecessors received and to which she believes she is entitled. Absent some evidence regarding the allegedly similar employees, the court cannot conclude that Plaintiff was treated differently than similarly situated employees. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1398 (7th Cir. 1997) (holding that plaintiff could not state indirect claim of discrimination "without

16

evidence of similarity"); *McPhaul v. Board of Comm'rs of Madison County*, 226 F.3d 558, 565 (7th Cir. 2000) (holding that plaintiff had not stated indirect claim of discrimination because she had not identified any co-worker with similar performance evaluations); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1371 (7th Cir. 1993). Nor has Plaintiff presented any evidence that prior City Managers were subject to the same performance standards or subordinate to the same supervisor. She has not, for example, presented evidence that her predecessors were employed under an identical employment contract (or a contract identical in the relevant respects regarding termination). Nor has she presented any evidence that her predecessors were employed by the same City Council members or Mayor that were responsible for her own termination. There is simply no evidence that any prior City Managers were similarly situated to Plaintiff in relevant respects.

Plaintiff also claims that she was similarly situated to other Class A employees who received notice and an opportunity to correct any employment deficiencies. Again, however, Plaintiff has not presented any evidence as to the similarly situated prong. Plaintiff's conclusory allegation that she was similarly situated to Class A employees is entirely insufficient. Plaintiff has presented no evidence of any formal policy concerning the termination rights of Class A employees. Even if she had presented such evidence, the fact that her contract provided that she is entitled to the same rights and privileges as Class A employees is not, as Plaintiff appears to suggest, dispositive, because the contract contains the limiting language "[e]xcept as modified by the terms and provisions contained herein." (Employment Contract ¶ 13.) Even without this limiting language, a provision guaranteeing certain employment privileges is not sufficient to establish discrimination indirectly unless Plaintiff can show that she was treated differently than similarly situated non-minorities. Plaintiff has made no such showing.

17

Defendant's motion for summary judgment is granted as to Plaintiff's equal protection claims (Counts I and II).

## II.    Breach of Contract Claim

In Count IV, Plaintiff brings a claim for breach of contract, again invoking the contract provision that guaranteed certain privileges: "Except as modified by the terms and provisions contained herein, Joyce Parker shall be entitled to all other benefits and privileges afforded to Class A management level employees under applicable ordinances of the City of Elgin." (Employment Contract ¶ 13.) Under this provision, Plaintiff contends she was entitled to notice of and an opportunity to correct any performance deficiencies prior to any termination, and Defendant's failure to provide such opportunities constituted a breach of contract.

Plaintiff's employment contract provides that it shall apply for "an indefinite term." (Employment Contract ¶ 1.) Regarding termination, the contract provides that Plaintiff may terminate the agreement upon 28 days written notice, and that the contract "may be terminated by the City acting through its corporate authorities." (*Id.*) Defendant argues that these provisions create an at-will employment relationship.

The court agrees. Illinois courts have held that contracts of indefinite duration are terminable at the will of either party. *Lamaster v. Chicago and Northeast Illinois Dist. Council of Carpenters Apprentice and Trainee Program*, 766 F. Supp. 1497, 1499 (N.D. Ill. 1991) (citations omitted); *Jespersen v. Minnesota Mining & Mfg. Co.*, 183 Ill.2d 290, 293, 700 N.E.2d 1014, 1016 (1998), *citing Duldulao v. Saint Mary of Nazareth Hosp. Center*, 115 Ill.2d 482, 489, 505 N.E.2d 314, 318 (1987). Employment contracts are presumed to be at-will agreements. *Tolmie v. United Parcel Service, Inc.*, 930 F.2d 579, 580 (7th Cir. 1991), *citing Duldulao*, 115 Ill. 2d at 489, 505 N.E.2d at

18

317-18. This presumption may be overcome only where there has been a clear and definite promise of permanent or fixed duration employment. *Lamaster*, 766 F. Supp. at 1499. No such language appears in the contract at issue.

The contractual language providing that Plaintiff shall be entitled to all other benefits and privileges enjoyed by Class A management employees does not alter this analysis. Under the contract, Plaintiff is entitled to such treatment "[e]xcept as modified by the terms and provisions contained herein." (Employment Contract ¶ 13.) As noted, the contract contains provisions dealing with termination that supersede this catchall provision found in paragraph 13. *See Brzozowski v. Northern Trust Co.*, 248 Ill. App. 3d 95, 99, 618 N.E.2d 405, 408-09 (1st Dist. 1993) ("[W]here ambiguities exist in a contract between two provisions, the more specific provision relating to the subject matter controls over the more general provision.") (citation omitted). In any event, Plaintiff has not identified any applicable City ordinance establishing that "Class A" employees are entitled to notice and a hearing. Instead, Plaintiff relies on what she deems the City's "custom and practice" of providing Class A employees with notice and an opportunity to be heard regarding any alleged job deficiencies. (Plaintiff's Amended Complaint ¶ 5.) Even if Plaintiff had produced sufficient evidence that such a custom and practice existed, this is insufficient to overcome the express language of the contract. *See Emergency Medical Care, Inc. v. Marion Memorial Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996) ("In interpreting a contract, Illinois law requires that 'clear and unambiguous terms in the contract be given their ordinary and natural meaning.'"), *quoting CSX Transp, Inc. v. Chicago and North Western Transp. Co.*, 62 F.3d 185, 190 (7th Cir. 1995).

Defendant's motion for summary judgment is granted as to Plaintiff's breach of contract claim (Count IV).

19

## III.    § 1983 Procedural Due Process Claim

Plaintiff also brings a § 1983 claim alleging that Defendant violated her procedural due process rights by terminating her employment without providing any notice or a hearing. To maintain a procedural due process claim, a plaintiff must show that she suffered a deprivation of a cognizable property or liberty interest and that the deprivation occurred without due process. *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003), *citing Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Courts look to state law in determining whether an employee has a property interest in continued employment. *Luellen v. City of Chicago*, 350 F.3d 604, 613 (7th Cir. 2003), *citing Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Once a plaintiff has identified a protected property or liberty interest, due process guarantees "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), *quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Here, Plaintiff claims that her termination caused her to suffer (1) a loss of her property interest in continued employment and (2) a loss of her liberty interest in her occupation. The court will address these two claimed interests in turn.

### A.    Property Interest

Defendant urges that Plaintiff had no property interest in continued employment with the City. Specifically, the City notes that Plaintiff's employment contract stated that it would be in effect "for an indefinite term," and provided Plaintiff and the City with the power to terminate the contract. Under its terms, the contract could be terminated "by the City acting through its corporate authorities." (Employment Contract, ¶ 1.) As explained above, the court agrees that Plaintiff's employment contract established an at-will employment relationship. Nevertheless, Plaintiff contends that statements made by the Mayor and Corporate Counsel explaining that prior City

20

Managers and Class A employees had been given notice and an opportunity to correct any performance deficiencies prior to termination showed "that they either intended [that Plaintiff] receive such notice of deficiencies and opportunity to correct any deficiencies or that the agreement was amended to provide such terms." (Plaintiff's Memorandum in Opposition to Motion for Summary Judgment, hereinafter Pl.'s Reply Brief, at 7.) Even if accepted as true, however, these statements would not trump plain and unambiguous language of the contract, which defeats any such expectation. The contract clearly provides that the agreement may be terminated by Plaintiff, upon written notice, or by the City. The court will not consider extrinsic evidence to interpret the meaning of a clear and unambiguous contract. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996) *citing Arrow Master, Inc. v. Unique Forming, Ltd.*, 12 F.3d 709, 713 (7th Cir. 1993). As Plaintiff correctly notes, Illinois courts recognize that "[t]he principal objective in construing a contract is to ascertain and give effect to the intent of the parties;" this does not establish, however, that courts may determine the parties' interest by reference to evidence outside the four corners of the contract. *See Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill. App. 3d 929, 810 N.E.2d 658, 670 (2d Dist. 2004). To the contrary, extrinsic evidence is admissible only where the contract language is ambiguous on its face. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003) (citations omitted). "A contract is ambiguous only if the language employed is susceptible of different constructions when read in its plain and ordinary meaning." *Id., quoting Althoff Indust., Inc. v. Elgin Med. Ctr., Inc.*, 95 Ill. App. 3d 517, 420 N.E.2d 800, 803 (2d Dist. 1981). As noted, the terms of Plaintiff's employment contract are not ambiguous; therefore, the court will not consider the statements submitted by Plaintiff.

Nor has Plaintiff presented evidence of a contractual modification. Under Illinois law, a valid modification must satisfy all three requirements of a valid contract: offer, acceptance, and consideration. *International Business Lists, Inc. v. American Telephone & Telegraph Co.*, 147 F.3d 636, 641 (7th Cir. 1998) (citations omitted). "A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct. . . ." *Id.* The court is unmoved by Plaintiff's undeveloped suggestion that the statements made by Mayor Kelly and Corporation Counsel William Cogley constituted a proposed contract modification. Assuming those statements were made, they did not even purport to address or modify the termination provision of Plaintiff's contract.

Plaintiff was an at-will employee of the City, who had no constitutionally protected property right in continued employment. *Harris v. City of Auburn*, 27 F.3d 1284, 1286 (7th Cir. 1994) ("Our cases make clear that an at-will employee does not have a constitutionally protected property interest in his continued employment."), *citing Campbell v. City of Champaign*, 940 F.2d 1111, 1112 (7th Cir. 1991); *McMillian v. Svetanoff*, 878 F.2d 186, 191-92 (7th Cir. 1989).

### B.    Liberty Interest

Plaintiff also claims that the public nature of her termination has hindered her future employment prospects and, in turn, deprived her of her liberty interest in her occupation. (Pl.'s Reply Brief, at 8.) Since July 2003, Plaintiff has been employed by the City of Flint, Michigan at an annual salary of $85,000 – substantially less than the $124,000 annual salary she received during her tenure as Elgin City Manager. (Pl.'s 56.1(a) ¶ 165.) In light of this reduction in salary, Plaintiff argues that "it can be inferred that being 'axed' for 'poor performance' [in the words of a newspaper

article documenting her termination] has hindered her employment opportunities." (Pl.'s Reply Brief, at 9.)

The Seventh Circuit has recognized due process claims brought by employees claiming that their government employer has infringed their liberty to pursue the occupation of his or her choice. In order to bring such a claim, the employee "must show that (1) he was stigmatized by the defendant's conduct; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001), *citing Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 801 (7th Cir. 2000); *Strasburger v. Board of Education, Hardin Cty. Comm. Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998); *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991). The *Townsend* court observed that "at the heart of every claim that an employer has infringed an employee's liberty of occupation, is a charge that the 'circumstances of the discharge, at least if they were publically stated, had the effect of blacklisting the employee from employment in comparable jobs.'" *Townsend*, 256 F.3d at 670, *quoting Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987). Thus, a successful plaintiff must demonstrate that, through the public disclosure, "the employee's good name, reputation, honor or integrity . . . [was] called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field." *Id.* (citations omitted).

Although at least one newspaper article reported on the events leading up to Plaintiff's termination as City Manager, including the fact that she had received a poor performance evaluation, Plaintiff has not demonstrated that the information in the article was so stigmatizing as to make it "virtually impossible" for her to find future employment in her chosen field. *See Townsend*,

23

256 F.3d at 670 n.9 ("mere defamation coupled with a firing is not sufficient to state such a claim"), citing *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987). Indeed, although Plaintiff cites her work for the City of Flint as evidence that her employment opportunities have been compromised, the court notes she was retained as a consultant for the City of Flint the same month she began looking for work, and now holds a full time position there. If there is some evidence that the City of Flint, or any other potential employer, was influenced by the Elgin press coverage, Plaintiff has not cited it.

Defendant's motion for summary judgment as to Plaintiff's procedural due process claim (Count III) is granted.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment (Doc. No. 14-1) is granted.

ENTER:

Dated: August 30, 2005

REBECCA R. PALLMEYER
United States District Judge